IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DOUGLAS T. WILLIAMS,<br><br>    Defendant. | Case No. 3:22-CR-30143-NJR-1 |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion to Suppress Evidence and Statements filed by Defendant Douglas T. Williams. (Doc. 25). Williams is charged with one count of possession of a firearm as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 1). He seeks to suppress evidence seized and statements he made, arguing they were obtained in violation of the Fourth Amendment to the United States Constitution. (Doc. 25). The Government opposes the Motion. (Doc. 38). For the reasons set forth below, Williams's motion to suppress is granted.

### BACKGROUND

The following facts are established by the Sauget Police Department Report and surveillance video of the incident that occurred around 5 a.m. on September 17, 2022. (Docs. 38-1, 39). Officer Aaron Morgan of the Sauget Police Department was parked in a marked police SUV, tucked between two semi-trucks on a lot just north of Route 3 Fuel and Liquor in Sauget, Illinois. (*Id.*). Route 3 Fuel and Liquor is a 24-hour gas station and

convenience store located a short distance from the courthouse and just outside several nightclubs and a diner. During the overnight hours, the doors to Route 3 Fuel and Liquor are locked and customers must use outdoor purchasing windows.

At 5:00:17 a.m., a black truck pulled up to a gas pump. (Doc. 38-2). Shortly thereafter, Defendant Douglas Williams exited the passenger side door wearing sweatpants, a hoodie, a hat, and slide-style sandals with socks. (Doc. 38-2). As Williams got out of the front passenger seat, Morgan observed him place a black handgun in the front pocket of his hoodie. (*Id.* at p. 2). Williams then walked to an outdoor purchasing window and got in line behind another customer. (Doc. 38-3). Morgan advised another officer via radio of a male armed with a handgun. (Doc. 38-1 at p. 2).

Surveillance video from another angle shows Williams standing in line with his hands in his front hoodie pocket as several other people come and go from the storefront. (Doc. 38-3). When it is his turn, Williams approaches the window and appears to purchase something from the store clerk, retrieving his ID or possibly a credit card from his pocket and sliding it through the slot at the bottom of the window. (*Id.*). Williams's left hand remained in the pocket where the gun was located. (*Id.*). Williams looks to be conducting a normal convenience store transaction and does not appear nervous or to make any furtive movements. (*Id.*).

At 5:04:02 a.m., more than two minutes after Williams first entered the line, an officer with a SWAT shield appears from one side of the building with his gun drawn and pointed at Williams, while Morgan approaches Williams from behind with a gun in his left hand. (*Id.*). Another officer, who is initially off camera, approaches from the

opposite side of the building. (*Id.*). Williams does not appear to notice any of the officers. (*Id.*). Morgan then walks directly behind Williams and sticks the barrel of his gun into the back of Williams's head, pushing his head and neck forward. (*Id.*). Within three seconds, with his gun still pushed into Williams's head, Morgan begins searching Williams. (*Id.*). Upon withdrawing the gun from Williams's pocket, Morgan places Williams's hands behind his back and handcuffs him. (*Id.*).

According to Morgan's report, he and the other officer "approached the male, asking if he had a valid FOID card." (Doc. 38-1 at p. 2). Williams responded, "No, what is that?" (*Id.*). Contrary to the surveillance video, Morgan's report says he handcuffed Williams behind the back before removing the handgun from Williams's pocket. (*Id.*). Morgan's report states that he then performed a records check on Williams through dispatch, confirming Williams did not have a valid Firearm Ownership Identification ("FOID") card or Concealed Carry License ("CCL"). (*Id.*). Morgan then placed Williams in the rear of his police vehicle and transported him to the Sauget Police Department for processing. (*Id.*). The report does not mention the fact that Morgan held his gun to the back of Williams's head.

Later that day, Detective Anthony Parisi interviewed Williams. (Doc. 38-1 at p. 4). After receiving his *Miranda* rights, Williams admitted purchasing the gun "from a guy" for self-defense and that he did not have a FOID card or CCL. (*Id.*). Williams also admitted that he is a convicted felon and that he knew he was not supposed to have a gun. (*Id.*).

On December 13, 2022, Williams was charged by Indictment with possessing a .9mm Taurus handgun while he knew he was a convicted felon. (Doc. 1).

### EVIDENTIARY HEARING

"District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). To be granted an evidentiary hearing, "the defendant's allegations and moving papers must be "sufficiently definite, specific, non-conjectural and detailed." *Id.* It is the defendant's burden to both identify a disputed factual issue and demonstrate its materiality. *Id.*

Here, Williams requests an evidentiary hearing to resolve any factual disputes raised by the Government's response, but the Government's statement of the facts is aligned with Williams's account of the facts. Thus, this Court is not required to hold an evidentiary hearing.

### DISCUSSION

The Fourth Amendment to the U.S. Constitution protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness," which is "measured in objective terms by examining the totality of the circumstances." *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022), *cert. denied*, 214 L. Ed. 2d 454, 143 S. Ct. 754 (2023) (quoting *United States v. Price*, 28 F.4th 739, 748 (7th Cir. 2022) and *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc)).

"Warrantless searches are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *United States v. Davis*, ---F.4th----, 2024 WL 4432499, at *2 (7th Cir. Oct. 7, 2024) (quoting *United*

*States v. Salazar*, 69 F.4th 474, 477 (7th Cir. 2023)). One of those exceptions is an investigatory stop based on reasonable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 21–22 (1968). Reasonable suspicion exists only when an officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (quoting *Terry*, 392 U.S. at 21).

To be lawful, an investigatory stop "must be limited in scope and executed through the least restrictive means." *Id.* (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)). "Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a *de facto* arrest." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). "For example, probable cause may be required when police restraint is so intrusive that, while not technically an 'arrest,' it may be 'tantamount' to an arrest." *Id.* A stop morphs into an arrest "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Eymann*, 962 F.3d at 284. "Several factors are relevant in deciding whether a *Terry* stop has become an arrest[,] including the officer's intent in stopping the individual, whether there was a search, whether, or how much, questioning occurred, whether there was a show of force and whether the person stopped could be said to have been taken into custody." *Id.* (quoting *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987)).

### A. Reasonable Suspicion that Criminal Activity Was Afoot

Williams argues that when Morgan held his gun to the back of his head and

searched his sweatshirt, he was seized for purposes of the Fourth Amendment without reasonable suspicion or probable cause. Williams asserts that Morgan's narrative lists no law he suspected Williams of breaking, and it is legal for people in Illinois to possess guns. Although proper licensing may be required, "the mere possession of a gun outside of a home no longer necessarily amounts to criminal conduct, and thus it no longer automatically provides probable cause for an arrest (or a search) in every instance." *People v. Jenkins*, 2021 IL App (1st) 200458, ¶42, *appeal denied*, 187 N.E.3d 728 (Ill. 2022). Williams argues that Morgan simply saw a Black man place a gun in his hoodie pocket and walk to the convenience store purchasing window. And even if this were enough to conduct a *Terry* stop, he argues, there is no evidence to support the use of a gun to the back of his head. Williams contends that the gun to his head, along with the other guns pointed at him, and the use of a ballistic shield constitute an arrest without probable cause.

In response, the Government argues that at the time Morgan detained Williams, he possessed specific, articulable facts supporting a reasonable suspicion that criminal activity was afoot. That is, Route 3 Fuel and Liquor is in a high-crime area, and Morgan observed Williams place a gun into his hoodie pocket. Williams then walked to the purchasing window with his hand resting upon the concealed firearm. At that point, based on the facts known to Morgan, he had reasonable suspicion to detain Williams.

The Government is correct that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," and whether the stop occurs in a "high crime area" is a relevant consideration. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). But

being in a high crime area is not, in itself, sufficient to establish reasonable suspicion. *See id.* Furthermore, under Illinois law, "the possible observation of a handgun is not in itself, without any other evidence of a crime, sufficient to provide an officer with probable cause for arrest." *People v. Bloxton*, 178 N.E.3d 766, 771 (Ill. App. Ct. 2020); *see also People v. Jenkins*, 193 N.E.3d 722, 732 (Ill. App. Ct. 2021) ("[T]he mere possession of a gun outside of the home no longer necessarily amounts to criminal conduct, and thus it no longer automatically provides probable cause for an arrest (or a search) in every instance.").

Even if the combination of these factors—the location of Route 3 Fuel and Liquor and the sight of a gun—gave Morgan reasonable suspicion to conduct a *Terry* stop, Williams argues that the detention turned into an arrest when Morgan put his gun to the back of Williams's head. The Government disagrees, citing two cases where drawn weapons and handcuffs were deemed appropriate for officer safety and did not turn a stop into an arrest.

In *United States v. Olson*, 41 F. 4th 792 (7th Cir. 2022), the city of Madison, Wisconsin, was "embroiled in violent and disruptive protests" in the wake of George Floyd's death, with huge crowds "engaged in rampant looting, vandalism, arson, and widespread violence." Members of the Madison Police Department were targets of the violence, as protestors threatened them with injury or death while hurling projectiles at the officers. *Id.* at 795. The mayor even declared a state of emergency and set a city-wide curfew. *Id.* It was within that context that officers saw the defendant, Kyle Olson, exit a vehicle while drinking alcohol, check his surroundings to ensure he was not being watched, take a pistol from the trunk of his car, and tuck it into his waistband. *Id.* at 796.

Three officers then approached Olson with their guns drawn. *Id.* An officer ordered Olson to put his hands on top of the vehicle, which he did. *Id.* Two officers secured Olson's hands while the third officer patted him down for weapons, finding the pistol in his waistband. *Id.*

The government charged Olson with one count of possession of a gun as a felon, and he moved to suppress the gun as the fruit of an illegal search. *Id.* at 797. Olson argued that the officers either arrested him without probable cause, or the stop was an unconstitutional *Terry* stop lacking reasonable suspicion. *Id.* The Seventh Circuit noted that "law enforcement's use of force does not necessarily transform a *Terry* stop into an arrest where the circumstances give rise to a justifiable fear for personal safety." *Id.* at 799. If, however, the use of force is "disproportionate to the purpose of such a stop in light of the surrounding circumstances . . . the encounter becomes a formal arrest." *Id.* (citation omitted). "Given the unique and extreme circumstances of the night in question," the court found that "the officers' use of force when approaching Olson was eminently justifiable." *Id.* Accordingly, the Seventh Circuit held that Olson's seizure was a *Terry* stop requiring only reasonable suspicion, not a *de facto* arrest. *Id.*

The Government also cites to *United States v. Eatman*, 942 F.3d 344 (7th Cir. 2019), where law enforcement officers were responding to a 911 call regarding a potential domestic dispute. The caller, an apartment security guard, reported that a tenant had been struck by her boyfriend, Micha Eatman, who was trying to gain access to her apartment. *Id.* at 346. When officers arrived, the guard escorted them to the woman's floor and told them Eatman may have a gun. *Id.* As the officers exited the elevator, they

observed Eatman pounding on the door and yelling to be let inside. *Id.* The officers told Eatman to put his hands on the wall, and a frisk uncovered a loaded gun in Eatman's waistband. *Id.* The officers then handcuffed Eatman before asking whether he possessed a valid FOID card or CCL. *Id.*

Upon being charged with one count of possession of a firearm by a felon, Eatman moved to suppress the gun. *Id.* On appeal of the denial of his motion to suppress, Eatman argued that the officers lacked probable cause to arrest him when they handcuffed him without knowing whether he could lawfully possess the gun. *Id.* at 346-47. Specifically, Eatman argued that the use of handcuffs was unreasonable when his gun had already been seized, he had not acted violently toward the police, and the four officers outnumbered him in the hallway while his girlfriend was locked inside the apartment. *Id.* at 348. The Seventh Circuit disagreed, finding that the officers were acting on information that Eatman had just committed a battery and may have a weapon. *Id.* The court concluded that "[t]he officers' experiences in conjunction with the information presented to them made the use of handcuffs reasonable in relation to the gravity of the situation" and did not turn the stop into an arrest. *Id.*

In both *Olson* and *Eatman*, the officers were entering unstable environments where emotions were running high. In *Olson*, the defendant was drinking alcohol while carrying a gun during the violent protests after George Floyd's death. In *Eatman*, the defendant was involved in a domestic assault, he was banging on his girlfriend's door, and he was believed to be armed. Given the totality of those circumstances, the Seventh Circuit found that the use of force was reasonable and did not transform those stops into arrests.

This case is different. Williams had not been involved in any altercation or fight, he was not joining a protest, and there were no 911 calls about him. From the surveillance video, it appears Williams just wanted to purchase something at a convenience store. The Government argues that Route 3 Fuel and Liquor has been the scene of numerous violent gun crimes over the years, pointing to a Hobbs Act Robbery that occurred in 2021, two murders that occurred in 2010 and 2015, and two murders in 2022 at the adjacent nightclubs, not the gas station itself. The Court is not convinced that these crimes, which occurred over the span of a decade, justify Morgan's use of force on Williams. When Morgan pushed the barrel of his gun into the back of Williams's head while Williams was simply standing in line at a convenience store, the incident exceeded the bounds of a lawful *Terry* stop and became a *de facto* arrest. *See Olson*, 41 F. 4th at 799 (holding that an encounter becomes a formal arrest when the use of force is disproportionate to the purpose of the stop in light of the surrounding circumstances).

    B.    **Probable Cause to Arrest**

A warrantless arrest complies with the Fourth Amendment when it is supported by probable cause. *Davis*, ---F.4th----, 2024 WL 4432499, at *3. "Officers have probable cause to arrest when the facts and circumstances known to them 'reasonably support a belief that the individual has committed, is committing, or is about to commit a crime.'" *Id.* (quoting *Doe v. Gray*, 75 F.4th 710, 718 (7th Cir. 2023)). "[W]hen officers make an arrest for a violation of state law, probable cause depends on 'the elements of the predicate criminal offense(s) as defined by state law.'" *Id.* at *2 (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 715 (7th Cir. 2013)).

As discussed above, Illinois law is clear that the observation of a gun, without any other evidence of a crime, is insufficient to establish probable cause for an arrest. *Bloxton*, 178 N.E.3d at 771; *Jenkins*, 193 N.E.3d at 732 (holding that mere possession of a gun no longer automatically provides probable cause for an arrest or search in every case). Indeed, multiple Illinois appellate courts have found that police need probable cause to believe—not only that the defendant possessed a gun—but that his possession was illegal. *See, e.g.*, *People v. Lyke*, 2021 IL App (1st) 170371-U, 2021 WL 1159557, at *5 (Ill. App. Ct. Mar. 25, 2021).

The Government argues that while it may no longer be illegal to possess a gun in Illinois, a person in possession of a weapon still must have it fully or partially concealed and be in possession of a FOID card and CCL. Illinois's Firearm Concealed Carry Act defines a "concealed firearm" as "a loaded or unloaded handgun carried on or about a person **completely or mostly concealed from view of the public** or on or about a person within a vehicle." 430 ILCS 66/5 (2016) (emphasis added); *see also Sinnissippi Rod & Gun Club, Inc. v. Raoul*, --- N.E.3d ---, 2024 WL 886651 (Ill. App. Ct. Mar. 1, 2024) ("[A]concealed carry license permits a licensee to publicly carry a loaded or unloaded firearm, on or about his or her person, fully or partially concealed from the view of the public.").

The Government contends that Morgan had probable cause to believe that Williams committed a crime—*i.e.*, a violation of the Concealed Carry Act—when Morgan saw Williams move the gun to his pocket. The Government asserts that a gun must be "completely or mostly concealed from the view of the public," and even a momentary exposure of a gun is a violation of the Act. The Court is not persuaded by this argument,

however, as the cases cited by the Government involve either the possession of a gun in a vehicle or a defendant who, upon seeing police, handed the gun to another person before fleeing. *See People v. Turnipseed*, 2020 IL App (1st) 170899-U, 2020 WL 5094821 (Ill. App. Ct. Aug. 28, 2020); *People v. Balark*, 147 N.E.3d 811, 816 (Ill. App. Ct. 2019); *People v. Thomas*, 129 N.E.3d 584 (Ill. App. Ct. 2019).

The Government also relies on *United States v. Alexander*, 78 F.4th 346 (7th Cir. 2023), to support its position that Morgan had probable cause to arrest Williams. In that case, the Chicago Police Department was alerted to possible gunshots on the city's west side and began monitoring the area via remote-controlled surveillance cameras. *Id.* at 347. The police observed a group of people congregating and witnessed a man hand a gun to the defendant, Tyquell Alexander. *Id.* Alexander held the gun openly for approximately five seconds before concealing it in his front waistband. *Id.* When the officers arrived at the scene, Alexander turned the opposite direction, stepped behind another man, and moved toward a metal fence that blocked his path from the officers. *Id.* Alexander tried to push against the fence, but the officers grabbed his arms, handcuffed him, frisked him, and found the gun. *Id.*

Alexander was charged with being a felon in possession of a firearm, and he moved to suppress the evidence against him. *Id.* On appeal from the denial of his motion to suppress, the Seventh Circuit reviewed the facts only under the more demanding standard of probable cause to arrest rather than whether the officers had reasonable suspicion to frisk Alexander. *Id.* In doing so, the court found that the officers had probable cause to arrest Alexander because they saw him openly carry a weapon in violation of

Illinois's Firearm Concealed Carry Act. *Id.* at 348 (citing 430 ILCS 66/5, 66/10) (allowing a person with a license to carry a firearm on a public street only if it is "completely or mostly concealed from view"). While Alexander argued that his "subtle and limited movements" when the officers arrived did not give the officers reason to believe his possession of the weapon was unlawful, the Court of Appeals disagreed, observing that Alexander's furtive movements were just "one data point among the totality of circumstances that could establish probable cause." *Id.* The court concluded that "objectively reasonable officers could infer criminal activity from their knowledge that [Alexander] possessed a gun . . . and his furtive movements upon their approach." *Id.* The court thus affirmed the denial of Alexander's motion to suppress. *Id.*

Here, the Government asserts that Williams is "just like Alexander" because once he stepped out of the truck, Morgan had probable cause to believe that Williams violated the Concealed Carry Act. Morgan's report, however, says nothing about the gun being "fully visible" or "openly carried" by Williams. The report states that as Williams "exited the front passenger seat, I observed him place a black handgun in the front kangaroo pocket of his hooded shirt." (Doc. 38-1). Presumably the gun was a least partially concealed by Williams's hand as he placed it in his pocket.[1] The report also does not say that the gun was visible to the public. (*Id.*). Indeed, the surveillance video provided by the Government shows no one behind Williams as he emerges from the truck. Even

---

[1] Compare the facts of this case with those in *People v. Martin*, where the defendant was observed "flashing a gun" at a gas station. *People v. Martin*, 2024 IL App (1st) 221562-U, 2024 WL 4346528 (Ill. App. Ct. Sept. 30, 2024). The Illinois Court of Appeals found it significant that the defendant was "flashing" the gun, which indicates he was doing so "repeatedly or consistently" in a public place. *Id.* at *9. Thus, the court held, even if the defendant had a FOID and CCL, he would have violated the Concealed Carry Act. *Id.*

Morgan's police vehicle is so far away that it is not visible in the video until Morgan drives forward toward the convenience store.

The Court is mindful that "police officers must make a quick decision about how to protect themselves and others from possible danger," and they are "not necessarily required to 'adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter.'" *Tilmon*, 19 F.3d at 1225 (quoting *Michigan v. Long*, 463 U.S. 1032, 1052 (1983)). A court should "consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* (quoting *United States v. Sharpe,* 470 U.S. 675, 686 (1985)).

But there was no swiftly developing situation here. The only facts known to Morgan was that Williams was a Black man with a gun in his hoodie pocket in an area where crime had occurred in the past. In other words, at the moment Morgan put his gun on the back of Williams's head, he lacked probable cause to arrest him.

## Conclusion

For these reasons, the Court finds that search and seizure of Defendant Douglas Williams on September 17, 2022, violated his Fourth Amendment rights. Accordingly, Williams's Motion to Suppress (Doc. 25) is **GRANTED**. All evidence obtained as a result of the unlawful search and seizure is suppressed.

**IT IS SO ORDERED.**

DATED: October 24, 2024

*[signature]*

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**